### RICE et al. v. SAYERS et al.
### No. 6488.

United States District Court
D. Kansas.
July 3, 1951.

635

W. D. Jochems, Emmet A. Blaes and Robert G. Braden (of Jochems, Sargent & Blaes), all of Wichita, Kan., for plaintiffs.

W. L. Sayers and C. E. Birney, Hill City, Kan., and Jerry E. Driscoll (of Driscoll & Driscoll), Russell, Kan., for defendant trustees and for Atchison County Community High School of Effingham, Kan., and Rural High School Dist. #3, Hill City, Graham County, Kan., intervenors.

James P. Mize (of Clark & Mize), Salina, Kan., for Kansas Wesleyan University of Salina, Kan., and its Board of Trustees.

Harold R. Fatzer, Charles H. Hobart, Topeka, Kan., and Willis H. McQueary, Osawatomie, Kan., for University of Kansas, Lawrence, Kan., and its Board of Regents.

MELLOTT, Chief Judge.

Plaintiffs, who are nieces, nephews or descendants of deceased nieces and nephews of Augustus J. Rice, commonly known as A. J. Rice, seek to impress a resulting trust in their favor upon the assets now held by the defendant trustees under testamentary trusts. The beneficiaries under the several trusts, duly made parties herein, Fed.Rules Civ.Proc. rules 20 and 24, 28 U.S.C.A., have answered and join with the defendants in asserting that the trusts are valid and should be upheld.

After a somewhat lengthy trial, during which numerous exhibits were received in evidence, all interested parties filed briefs. The pressure of court work has militated against as prompt a disposition of the controversy as the court would wish.

Following many of the findings hereinafter set out, the court has indicated, in parentheses, exhibits or pages of the record. The references are illustrative only and no attempt has been made to collate

all of the evidence supporting any particular finding. Based upon the whole record, the court now makes the following:

## Finding of Facts

1.

Augustus J. Rice, hereinafter referred to as A. J. Rice, died testate at the age of 85, on August 27, 1926. A resident of Hill City, Graham County, Kansas, he had never married and was not survived by a spouse or by any children. His parents and his nine brothers and sisters had all predeceased him. The plaintiffs in this action are children and grandchildren of his deceased brothers, Elias, George and Elijah. (P.Ex. 9.)

2.

At the time of his death, A. J. Rice was seized of a substantial estate in Kansas, comprising several thousand acres of land located chiefly in the counties of Atchison, Graham, Rooks, and Russell, and personal property, all appraised as of the date of his death, in the aggregate amount of $211,-860.13. There were mortgage encumbrances against some of the realty, amounting to approximately $65,000, and interest thereon and taxes were delinquent.

3.

The last will and testament of the decedent (as modified by two duly executed codicils) was admitted to probate in the Probate Court of Graham County, Kansas, on September 14, 1926. The estate was settled and closed on or about the 21st day of September, 1929, at which time the residuary property was, by order of the Probate Court, duly assigned and delivered by the executors to the testamentary trustees named in the will. Previous thereto the probate court had made an order, on October 10, 1928, requiring the trustees— who were the individuals then serving as executors—to give a bond, they having filed an election "to continue the administration of said estate under orders of said court." (D.Ex.B(30). The inheritance tax commission of the State of Kansas determined that no tax was chargeable against the succession to any distributive share of

the estate (D.Ex.B(22), and the United States Treasury Department closed the records of the bureau following a finding that no deficiency in estate tax was due, no tax having been reported. (D.Ex.B(29).

4.

Summarizing the will, under item I the debts were to be paid and a monument erected. Under item II, directions as to burial were made and under item VIII, instructions were given with relation to the compensation of the trustees. The other items in the will were subsequently modified and are not summarized at this juncture. The will was executed on April 17, 1919. (D.Ex.B(2). In a codicil added to the will on September 12, 1919, the testator directed that the term or terms "physiological therapeutics," "physiology" and "physiology and hygiene" be "construed to include 'physiology and hygiene' in the broadest and most practical signification of said term." (D.Ex.B(3).

5.

A second codicil to the will, executed October 1, 1925, completely changed items III, IV, V, VI, VII, IX and X. Under item III, as changed, the sum of $10,000 was bequeathed to the designated trustees to be held for the benefit of Rural High School District No. 3 of Hill City, Kansas, " * * * for the specific purpose of paying the expense in said school of teaching physiology, hygiene and hydropathy, and in connection therewith electrical massaging and all curative methods included in the term physiological therapeutics; courses in prevention of tuberculosis, typhoid fever, malaria, diptheria, the causes and prevention of such diseases as Bright's disease and heart disease and the various occupational and industrial diseases; the treatment of crippled and deformed children by means of electrical massaging, exercises, etc.; to care for and treat tuberculous patients and thus prevent the spread of tuberculosis; to teach how to properly prepare food, how to bathe the sick, and how to prevent sickness and disease; analyze foods, and the process of digestion and assimilation, and the quality and kind

of foods required for human beings to bring about their best development; the care and feeding of infants; and evils of the use of narcotic drugs as a medicine or for any other purpose when taken internally it being the purpose of this bequest to demonstrate to future generations the utter uselessness of narcotics and drugs in all forms when taken internally and to prove the use of the same is not only unnecessary but is positively injurious to the human system and destructive of health and longevity. Students in said high school shall be given a preparatory course to fit them to take up the same line of training in the University at Lawrence or Salina, Kansas."

6.

Under item IV as changed, substantially the same provisions were made for the payment of the income from $10,000 to the Board of Education or directors of the County High School of Atchison, Kansas, situated at Effingham.

7.

Under item V, "all the rest and residue" of decedent's estate "remaining after paying the preceding bequests" was bequeathed to the trustees "for the following uses and purposes, to wit:—

"The said trustees and their successors in trust shall invest and re-invest the remainder of my estate, after the same has been converted into cash, in such high class securities as will produce the largest income without impairment of such fund, and said trustees shall pay annually the net income thereof to such body as shall be constituted by law as the board of directors or trustees of the Kansas State University situate at Lawrence, Kansas, and to the Board of Trustees of the Kansas Wesleyan University of Salina, Kansas in equal shares for the purpose of installing a chair in each of said Universities for the purpose of teaching the natural laws of health, the natural food for man, a balanced ration for the human family; and in connection therewith hydropathy, electrical massaging and all of the curative methods included in the term physiological therapeutics; courses in the prevention of tuberculosis, typhoid fever, malaria, diptheria, the causes and prevention of such diseases as 'Bright's' disease and heart disease and the various occupational and industrial diseases; the treatment of crippled and deformed children by means of massages, exercises, braces, etc.; to help expectant mothers to prepare for their offsprings and to teach them how to care for them; to care for tuberculous patients and thus prevent the spread of tuberculosis; to teach how to properly prepare food, how to bathe the sick and in general how to keep clean and well and how to prevent sickness and disease; also how to care for and dress injuries and wounds of all kinds; how to care for mothers and babies at maternity; a knowledge of sexual science; how to analyze foods and the process of digestion and assimilation and the kind and quality of food required for human beings and suited for their best development; the evils of the use of narcotic drugs as a medicine or for any other purpose when taken internally; it being the purpose of this bequest to demonstrate to future generations the utter uselessness of narcotic drugs and narcotics in all forms when taken internally, and to prove that the use of the same is not only unnecessary, but is positively injurious to the human system and destructive of health and longevity.

"Young men and women shall be trained in said institutions as nurses and doctors and diplomas in proper form shall be issued under such rules as the proper authorities shall prescribe.

"The Chairs provided for in this item shall be filled with professors who shall have graduated from an institution the teachings of which are in accord, as near as may be, with the purposes and theories recited in this item of my will, and are also graduates of some standard medical school of the United States or Europe, if such can be obtained. It is hereby made the duty of my said trustees and their successors to see to it that the spirit and purpose of this clause of my will is strictly carried out in the theories and teachings promulgated by such funds herein provided, and if there shall be a disposition on the part of the authorities of the said Universities

to use said funds for the purpose of promulgating a system of therapeutics requiring or sanctioning the use of narcotic drug medication, then it is hereby made the duty of my said trustees to entirely withdraw this bequest, and they are hereby empowered to do so, and to apply the same to the purposes provided for in the following item:" (D.Ex.B(4).

Item VI was changed to read:

"In case the said Universities or either of them shall fail or refuse to accept its portion of the foregoing bequest on the terms herein specified, or in case it shall accept the same and my trustees or their successors shall thereafter feel or determine that said institution, or either of them have failed to use said funds in promulgating a doctrine in line with the provisions of the foregoing Item 5, then, and in that event, my said trustees and their successors are hereby authorized and empowered to withdraw from said beneficiary or beneficiaries, so in default, all funds and benefits hereunder and in case of default on part of one, only of said beneficiaries, the benefits hereunder shall be diverted by my said trustees to the University not so failing and in case of such default on the part of both said Universities, then, I hereby give, devise and bequeath to my said trustees and their successors in trust, the estate mentioned and described in the foregoing item, but in trust nevertheless for the following purposes, that is to say:—Said trustees shall use such portion of the principal funds of said estate as they shall deem advisable for the purpose of establishing at or near Topeka, Kansas, a school and hospital for training nurses and teaching the doctrines provided for in Item 5 hereof.

"A suitable site shall be purchased at such place and there shall be established on said site a school and hospital for training nurses and other persons to treat diseases by the various means included in the terms physiological therapeutics, including hydropathy and also to teach the elements of surgery. Said trustees shall erect suitable buildings on said site and shall employ a suitable person or persons to manage the same and to teach and otherwise promulgate to the people the doctrines and theories

recited in Item 5 hereof. Said institution shall be conducted as a sanitarium and shall be modeled after the Nebraska Sanitarium located at College Grove, Nebraska, which is in the suburbs of Lincoln, Nebraska, but the institution herein provided for shall be non-sectarian. I recommend that the faculty of this institution shall publish a magazine to advertise the school and to teach the laws of health. In course of time the said trustees may also provide for the training of doctors along the lines herein indicated.

"In case the proper authorities of the High School at Hill City, Kansas, shall decline to accept the funds provided in Item 3 hereof, or having accepted the same shall fail to apply said funds to the objects in said item recited, my said trustees and their successors are hereby authorized to withdraw said funds from said institution and said funds shall become a part of my general estate and shall be applied to the purposes recited in Item 5 or 6 as the case may be.

"In case the proper authorities having charge of the High School at Effingham, Kansas, shall fail to accept the provisions recited in Item 4 hereof, or having accepted the same shall fail to provide for the application thereof to the purposes recited in said Item 4, my said trustees and their successors in trust are hereby authorized to withdraw the benefits of said funds from said institution and the same shall become a part of my general estate and shall be applied to the purposes recited in Items 5 and 6 hereof as the case may be.

"All funds of my estate not used in establishing and building the institution provided for herein shall be invested until so used and the income therefrom shall be used for the upkeep of said school."

8.

Under item VII as changed, provision was made for the appointment of successor trustees; item IX as changed provided that the funds should be known as the A. J. Rice Memorial Fund; and item X was changed to read as follows: "I hereby appoint James H. Rogers, Earl Farrish and C. L. Cummings and W. S. Heffelfinger and W. L. Sayers, executors of this my

last will and testament and authorize them to lease or sell and convey by deed any and all real estate belonging to my said estate without first procuring an order of the Probate Court directing the same, when in the judgment of said executors it is deemed to be to the best interest of my said estate, and until said real estate be sold that said executors manage my said real estate and turn over the income thereof to my said trustees but if at the expiration of two years from the date of the probating of this will any of said real estate shall remain unsold, my said executors shall thereupon convey by deed all of my said real estate remaining unsold to the aforesaid trustees, in trust for the purposes and to carry out the trusts aforesaid, and I hereby authorize the aforesaid trustees or their successors to convey any real estate belonging to my said estate or trust without the order of the court and at such time or times as in their judgment it is to the best interest of said trusts that the same be sold and conveyed, all matters pertaining to the price and terms of payment to be left in the discretion of my said trustees."

### 9.

The trustees and their successor trustees have administered and handled the trust estate since September 21, 1929, under the orders and directions of the Probate Court of Graham County, Kansas, and have made and filed their annual reports and accounts in that court, all of which have been approved. Only a small amount of the real estate has been sold. Most of it has been rented for cash or grain rents and the income derived has been applied to the payment of costs and administration, including the funeral expenses, monument, etc., taxes, and to the retirement of mortgage liens. (Pre-tr. 50–1 & Ex. B.) All of the tax liens, interest, mortgage encumbrances and debts have been fully paid and discharged. The value of the trust estate has increased substantially. There was no net income to distribute and no net income was accumulated until the year 1947 for the reason that until that time all of the income had been used to discharge debts of the trust estate and for necessary expenses of administration. As of December 31, 1948, the testamentary trustees had cash on hand of $11,662.26 and had purchased government bonds in the approximate amount of $40,042.63.

### 10.

On September 12, 1927, and while administration of the estate was pending in the Probate Court of Graham County, some of the plaintiffs herein and the predecessors of the others filed an action in the District Court of Graham County, Kansas, (D Ex. A (1) alleging, inter alia, that the testator, A. J. Rice, "was [when the purported will was signed] of unsound mind and * * * wholly without testamentary capacity, and that said purported will is therefore wholly invalid and ineffective." In Paragraph 5 of the petition it was alleged that the "purported will" is "invalid and ineffective in that the acceptance of its provisions by the beneficiaries therein named would be beyond the lawful powers of said beneficiaries and ultra vires and would be contrary to public policy, and that the provisions of said purported will are invalid in that they are in violation of the rule against the creation of perpetuities."

The prayer of the petition was that the "purported will be set aside, and that * * * [plaintiffs] have such other and further relief as to the court may seem just."

Following the issuance and service of summons, counsel employed by the executors and trustees pursuant to order of the probate court, and the Attorney General of the State of Kansas, filed a motion in the District Court "to strike and expunge from the plaintiff's petition the fifth paragraph thereof for the reason that said matter is a mere conclusion of law, is erroneous in law, constitutes no sufficient ground or reason for a contest of the will of the deceased, is redundant, irrelevant and immaterial and prejudices the right of the defendants in making their defense to the alleged cause of action set forth in the petition."

At the same time a document characterized "Demurrer" was filed, in which it was stated the defendants

"* * * demur to the * * * petition in so far as it relates to the ground and cause of action set forth in paragraph five thereof for the following reasons:

"1. That the same does not state facts sufficient to constitute a cause of action.

"2. Because the same does not state facts sufficient to show that the will of the deceased is void or voidable or subject to contest on the alleged ground or grounds set forth in said paragraph."

Following argument, the ruling shown below was signed by the trial judge and entered in the cause, viz.: "A demurrer having been filed by the defendants to certain portions of the plaintiff's petition and the same duly argued during the regular session of court at Hill City, Kansas, during the adjourned session of the September term, 1927, in said county, and thereafter taken under advisement. Now on this 25th day of January, 1928, the said demurrer having been carefully considered is by the undersigned sustained."

No appeal was taken from the ruling.

At the regular February, 1928 term of the District Court of Graham County, Kansas, trial was begun on February 21, 1928, before a jury duly impaneled and sworn. On February 22 the plaintiffs introduced evidence "in support of the issues and contentions on their part, and during the introduction of evidence on behalf of the plaintiffs and on the 23rd day of February, 1928, the plaintiffs moved the court to dismiss said cause for the reasons stated by counsel in open court and without prejudice to a future action." The motion was sustained and the cause was so dismissed. No action was thereafter instituted by the plaintiffs against the defendants herein to recover the trust property or otherwise until the commencement of the present action in this court on November 29, 1948.

### 11.

While no part of the trust estate or the income therefrom has been paid by the trustees to or for the purposes specified in the will and codicils, (Pre-tr. T 43-4) the defendant trustees have never in any manner denied or repudiated the rights of the beneficiaries named in the will nor have they acted hostile to their rights and interests. None of the beneficiary institutions has ever indicated any unwillingness to accept thereunder. They have intervened herein and, through their proper officers, have served "notice of acceptance of trust fund or funds in A. J. Rice will and trust estate." The notice filed on behalf of the Kansas State University states, inter alia, that said institution "* * * has been and now is authorized and directed to accept such trust property, fund or funds so provided under the will with codicils attached * * *; and that said institution, its officers and directors are now willing to accept such fund or funds, and that said institution is equipped in all respects to receive and apply said fund or funds to the objects and subjects in said will and codicils provided, and for the purposes recited in said instruments, and particularly Item V thereof and all other provisions thereof in connection therewith, and in fact to in all ways and manner provide for the application of such funds in accordance with the spirit, purpose, directions and intention of said testator, A. J. Rice, as definitely expressed by him in and under the terms and provisions of said will and codicils thereto; and that by so accepting such funds the Kansas State University is willing and is in all respects equipped to use such fund or funds as directed so that the theories and purposes as expressed in said instruments shall be, and will be, promulgated by the fund or funds so provided." (Ex. C, Answer of Trustees. Pre-tr. T 54.)

The notice filed on behalf of the Kansas Wesleyan University contains essentially the same language and also a request that the funds be paid over "to the end that * * * [they] may in all respects be applied to promulgate the theories and purposes as expressed in said instruments by the testator-settlor." (Ex. D to Answer of Trustees. Pre-tr. T 54.) The acceptances on behalf of the two high schools state, inter alia, that they are "* * *

authorized and do hereby accept the trust and the funds, or the portion of the bequests provided for such school district in and under the terms and provisions of the last will and testament with codicils attached thereto, of the late A. J. Rice, ratifying our former acceptance thereof heretofore made. * * * (A)nd its officers are qualified and equipped, and are willing to accept and apply the funds so provided in accordance with, and as provided by, the terms and provisions of said last will and codicils, and particularly the objects in item IV therein recited." (Exs. E & F to Answer of Trustees. Pre-tr. T 54.)

The trustees have taken no steps toward the building at or near Topeka of a school and hospital for training nurses and teaching the doctrines provided for in item V, as authorized in item VI of the second codicil.

## 12.

A drug is a substance used in the treatment of disease. A narcotic is a drug that produces a cerebral depression, a stupor. (T 34, 118.) In the practice of the profession of medicine, drugs are extensively used. (T 35–6, 120–2.) Narcotic drugs include opium and its derivatives; barbiturates; alcohol; ether; and a number of derivatives of barbituric acid. (T 36–7.) The use of narcotic drugs previous to operations is for the purpose of putting the patient at ease with regard to the procedures that will be involved in surgery and to do away with one of the elements that produce shock. (T 37–8, 122.) Narcotics are also used post-operatively for the purpose of allaying pain. (T 39–40.)

## 13.

Narcotics are valuable in reducing painful fractures and are quite generally used for that purpose by the medical profession. (T 43–4.) They are also extensively used in the treatment of coronary thrombosis, in apoplexy or rupturing of the arteries, in thrombophlebitis or blockage by a clot of a large vein (T 46, 129), and in all cases where it is deemed advisable to create a physiological rest such as in the treatment of tuberculosis, tetanus, burns, threatened abortion of an expectant mother, etc. They are also used to some extent in childbirth and in the treatment of various colics. (T 49–52, 136.) The use of narcotic drugs in incurable cancer is quite common, primarily for the purpose of being merciful to the patient by relieving his suffering and mitigating the agony of death (T 78); also in war surgery where there is no chance for a wounded soldier to recover and he is in constant agony and pain. (T 79.)

## 14.

Narcotics, by reducing convulsions, may prevent ruptures, but are not a specific for the cure of disease. (T 56.) Most narcotics are habit forming and can impair the mental ability and destroy the self-control and physical endurance of the user. (T 57.) The use of narcotics can destroy health, cause insanity and imbecility, and destroy human happiness. (T 58.) Cocaine is not a narcotic; it is a convulsant. The Harrison Narcotic Act, 26 U.S.C.A. §§ 2550 et seq., 3220 et seq., includes within its scope both narcotics and cocaine. (T 59, 131.) The injudicious use of narcotics may result in forming the habit of using them and, in teaching the action of a drug, it should be complemented by teaching the evil effects that can come if the drug is not used in the proper way. (T 70.) There is a definite possibility that the medical profession or science will discover adequate substitutes for the use of all narcotics, and research toward that end is now progressing. (T 66, 77.)

## 15.

The use of narcotic drugs in the treatment of nervous disorders or mental illnesses is quite common, especially for the relief of pain, including the disturbance of the sensory side of the nervous system. Narcotics are used for relief of the tentionary actions of patients. (T 84–6.) They are also used to bring to the surface the submerged material in a patient's subconscious mind so that it can be discussed in periods of therapy with the person to get him to understand what is wrong with him. They are used extensively in the acute emergency practice of psychiatry.

(T 86–8). Narcosynthesis is used in the formal practice of psychiatry for quickly alleviating the patient's tension reactions. (T 90.) The drugs used in narcosynthesis are barbiturate derivatives not mentioned in, or within the purview of, the Harrison Narcotic Act. They are superior for that purpose to morphine or the other narcotics referred to in the Harrison Narcotic Act. (T 99.) The first aid kit issued to soldiers in World War II contained, among other things, a syringe called a curet which had an individual dose of morphine with an attached needle so the soldier could administer a narcotic to himself in the case of extreme pain until first aid arrived. (T 112.)

16.

Hydropathy means the use of water in the treatment of certain ailments, including water taken internally as well as externally. It is a valuable preventive to certain types of kidney ailments. (T 63.)

17.

The high schools referred to in items III and IV of the second codicil to the will are tax supported public schools and are quasi-municipal corporations, duly constituted as such under the statutes of Kansas.

18.

The curricula and texts used by the high schools referred to in the will and codicil are prescribed by the Superintendent of Public Instruction of the State of Kansas, and some of the textbooks on health used in such schools describe and discuss the beneficial uses of drugs and the dangers of drug addiction or addiction to the use of narcotics. (T 166.) Some of them refer to the common narcotics which are used in combating pain as "beneficent but dangerous drugs." They point out that although such drugs are helpful in the hands of physicians, surgeons and dentists, they are "extremely dangerous for individual use." (T 167 (2). The textbooks also refer to other drugs which are taken internally such as quinine, sulpha drugs or penicillin. (T 167 (5–6). Physiology,

hygiene, hydropathy and the other subjects mentioned in items III and IV of the second codicil are taught in the two high schools named therein. (T 156–160.)

19.

The University of Kansas is a state owned public institution. It maintains a medical school and a hospital in Kansas City, Kansas, where it teaches various courses and subjects, including subjects dealing with Natural Laws of Health, Natural Foods For Man, A Balanced Ration For The Human Family, and in connection therewith, hydropathy, electrical massaging and all the curative methods included in the term physiological therapeutics, courses in the prevention of tuberculosis, typhoid fever, malaria, diphtheria, the causes and prevention of such diseases as Bright's disease and various occupational and industrial diseases, and the treatment of crippled and deformed children by means of massages, exercises, braces, etc. It offers courses to help expectant mothers to prepare for their offspring and how to care for them; to care for tuberculosis patients and prevent the spread of tuberculosis; and to prepare food properly. It teaches how to bathe the sick and to keep them clean and how to prevent sickness and disease; also how to care for mothers and babies at maternity. It also teaches sexual science; how to analyze foods; and the process of digestion and assimilation and the kinds and quality of food required for human beings and suited for their best development. (Stip.Pretr. T 55–6.)

In the hospital, operated in conjunction with the medical school, narcotic drugs are used in connection with the cure and treatment of the patients therein. There is no disposition on the part of the faculty of the school, either to discontinue the use of narcotic drugs at said hospital, or to discontinue teaching in the medical school the beneficial uses of such drugs. (Pretr. 14, 15.)

20.

The Kansas Wesleyan University of Salina, Kansas, is an educational, non-profit corporation organized in 1885 under the

laws of Kansas. Since the date of its organization, it has continuously owned and operated a co-educational college at Salina, offering training to men and women to prepare and fit them for nursing and as doctors. It offers qualified and accepted premedical instruction which is necessary and essential for the training of nurses and doctors and it is able to, and does, award diplomas and degrees to men and women students who successfully complete such instruction. Many of its alumni are practicing physicians and surgeons. Its board of trustees corresponds generally to the board of directors of an ordinary commercial corporation. (T 233–7, 240, 246–8, P Ex. 8.) In its teaching, emphasis is placed upon condemnation of the use of narcotic drugs by individuals for their personal satisfaction. It does not condemn the use of narcotic drugs by qualified physicians in accordance with the teachings of the medical profession in the alleviation of pain and the treatment of disease. In one of its courses, entitled "Hygiene 7", the school has used a text which recognizes that the intelligent use of narcotics brings immeasurable relief to human suffering. (T 245, 248–52.)

21.

The University of Kansas, and the Kansas Wesleyan University of Salina are ready, able and willing, when the funds provided by the will of the tetstator are paid to them by the trustees, to use said funds exclusively for the purpose of establishing and financing professorships in each of said schools to teach the matters set out in item V of the second codicil and to refrain from using any portion thereof to promulgate a system of therapeutics requiring or sanctioning the use of narcotic drug medication. (T 176–8, 184, 215–18, 246, 248–49.)

22.

Atchison County Community High School of Effingham, Kansas, and Rural High School District # 3, Graham County, Kansas, are ready, able and willing to use the funds provided by the will of the testator exclusively for the purpose of paying the expense of teaching the matters set out in items III and IV, respectively, of the second

codicil and to give to the students in said schools a preparatory course to fit them to take up the same line of training in the University of Kansas or the Kansas Wesleyan University of Salina. (T 157–60, 283–91; D.Ex. I.)

## Conclusions of Law

1.

This controversy is one in which there is diversity of citizenship and the requisite jurisdictional amount is in issue. The questions relate to the interests of heirs, devisees and legatees, and can be adjudicated without interfering with the control of the state probate court in the general administration of the estate. This court has jurisdiction over the parties and of the cause of action.

2.

■ The trusts created by the will and codicils of A. J. Rice are valid charitable trusts for educational purposes. They do not violate the rule against the creation of perpetuities, offend the public policy of Kansas, or require the performance of ultra vires acts.

3.

The equitable title to the trust estate has been, and is now, vested in the beneficiary institutions named in said will.

4.

The exclusive use of the net income from the trust property, as provided by the will and codicils, by the University of Kansas and by Kansas Wesleyan University of Salina, Kansas, for the purposes set forth in Finding No. 21, will be, and is, proper, adequate and complete compliance by said beneficiary schools, with the terms of the trusts created for their benefit.

5.

The exclusive use of the net income from the trust property, as provided by the will and codicils, by the Rural High School District # 3, Graham County, Kansas, and the High School of the County of Atchison at Effingham, Kansas, for the purposes set forth in Finding No. 22, will be, and is, proper, complete compliance by said bene-

ficiary schools, with the terms of the trusts created for their benefit.

## 6.

This court retains jurisdiction over the trust estate for the purpose of making fully effective all terms and conditions of the testator's will, including those in item VI of the second codicil.

## Opinion

The findings which have been made and the conclusions which have been reached are dispositive of all issues before the court. Complete rationalization of a contested issue of fact or of law and fact is seldom possible and will not be attempted here. Brief reference will be made, however, to some of the evidence and the contents of exhibits in order to make the discussion understandable.

The language of the will and codicils specifying the purposes for which the income is to be used gives rise to the present controversy; so it has been set out in full in the findings. On behalf of the plaintiffs it is urged, upon brief, that the universities and high schools fail "to qualify literally with the provisions of the purported trusts, [which] eliminates them from any possible interest in the trust estate, since the will contains alternative provisions controlling that very contingency;" that the trusts "are violative of public policy;" that "since * * * [they] serve no public purpose, they are not true charities, and are void under the rule against perpetuities;" that they "also violate the rule against perpetuities because of the remoteness of vesting;" and "being void, a resulting trust exists in favor of the heirs at law of the testator."

Before considering the several contentions, the jurisdiction and power of this court to act, assailed by the defendants and intervenors, should be explored.

All of the plaintiffs are citizens and residents of states other than Kansas, some being citizens of California and the remainder citizens of Canada. The defendants and intervenors are citizens of Kansas. The amount in controversy exceeds $3,000 exclusive of interest and costs. Jurisdictional requirements,[1] therefore, seem to be met. Nor is the question of comity present for several reasons: First, the questions raised are not "purely of a probate character relating to the administration of the estate of a deceased person;"[2] second, all questions now before the court may be adjudicated without interfering, in anywise, with the control of the probate court in the general administration of the estate; third, the jurisdiction of a Federal court may not be so limited or curtailed, by state legislation creating probate courts and vesting in them exclusive jurisdiction, as to deprive such a court of its equitable jurisdiction,[3] (and Kansas does not appear to have attempted to do so); and, fourth, under the applicable Kansas statutes, the Probate Court of Graham County, even though it may have attempted to exercise control over the testamentary trusts in issue, actually had no jurisdiction to do so.[4] This court, therefore, concludes that it has jurisdiction over the persons and the issues raised.

Another preliminary matter, which the court should examine, stems from the facts set out in Finding No. 10. At the time of the ruling of the trial judge, Kansas law required appeals from orders sustaining or overruling demurrers to be taken to the Supreme Court within six months or they be-

---

1. Title 28 U.S.C.A. § 1332. Rule 24, F.R.C.P. Rosenberg v. Baum, 10 Cir., 1946, 153 F.2d 10.

2. Rosenberg v. Baum, footnote 1, p. 12.

3. Payne v. Hook, 7 Wall. 425, 19 L.Ed. 260; Miami County National Bank of Paola, Kansas v. Bancroft, 10 Cir., 1941, 121 F.2d 921; Waterman v. Canal-Louisiana Bank Co., 215 U.S. 33, 30 S.Ct. 10, 54 L.Ed. 80.

4. Knox v. Knox, 87 Kan. 381, 124 P. 409; In re Estate of Thompson, 164 Kan. 518, 190 P.2d 879. While under the 1939 Probate Code the probate courts are given jurisdiction over trusts and powers created by wills admitted to probate, G.S.1949, 59–301(8), 59–1601 et seq., they had no such power under the earlier code and the new provisions apply "only to trusts the administration of which shall begin after the effective date" July 1, 1939, of the Act. G.S.1939 Supp. 59–1611.

came final.[5] Defendants and intervenors assert: "the orders of the court sustaining the demurrer and motion to strike are decisions on the merits, are in all respects final, and are *res adjudicata* of the issues or grounds of attack thereby disposed of." Plaintiffs, on the other hand, contend that the ruling did no more than to strike from the petition allegations which were redundant and irrelevant in a suit to contest the will and hence that the issues are properly raised in this proceeding.

The welter of Kansas cases cited by the parties upon some of the facets of the question referred to above, point up its difficulty. As defendants and intervenors urge, a ruling upon a demurrer from which no timely appeal has been taken, becomes— under the general doctrine of *res adjudicata*—the law of the case;[6] and *res adjudicata* not only prevents the relitigation of the same matters a second time, but applies to bar the litigation in a second suit of all matters which could have been litigated under the facts constituting the cause of action in the first suit.[7] But, as counsel for the plaintiffs correctly point out, the learned State District Court Judge, in holding that the paragraph in the petition against which the demurrer had been lodged stated no facts, was a mere conclusion of law and mere surplusage, simply struck it from the petition as having no bearing upon the question whether the proffered document should be permitted to stand as the will of the deceased. The suit was not thereafter pending long enough for the appeal to run on the ruling sustaining the demurrer—if such actually was the ruling—inasmuch as it was dismissed without prejudice within less than six months.[8]

Apropos the suggested query whether the trial court actually sustained a demurrer, it may be pointed out that under the code of civil procedure of the state of Kansas a demurrer to a *portion* of a petition does not seem to be permissible. Under 60–705,[9] "The defendant may demur to *the petition* (emphasis supplied) only when it appears on its face * * * [that one of the enumerated grounds exists]." Under 60–708,[9] "The defendant may demur to one or more of the several causes of action stated in the petition, and answer to the residue." It has not been suggested, in the case at bar, that the demurrer appearing to have been ruled upon by the trial court was "to one or more of the several causes of action stated in the petition." Indeed, defendants and intervenors, by their argument, take the opposite view. They contend the only relief sought in that case was to contest the will. This court implies no criticism of the action of the learned judge in the State District Court case; and this phase of the matter is passed by adopting the view heretofore suggested, that paragraph five of the petition was merely stricken on the ground that it was surplusage.[10] In that view, the claim of *res adjudicata* cannot be sustained.

A question somewhat akin to the one just discussed is whether the present suit is a will contest and hence barred by the statute of limitations.[11] Defendants and intervenors, upon brief, state that the instant proceeding is one "to strike down and destroy the testamentary trust;" that the "will stands as an impediment * * * and must be set aside before * * * [the plaintiffs] can receive or hope to receive anything;" that courts "look through and beyond the camouflage of wordage in order to ascertain the actual result sought;" that any action "set down on paper, which, if established, would necessarily render a will nugatory is a contest of the will;" and that an action such as this must be brought, in the language of the statute,[11] "within one year after the probate * * * and not

---

5. G.S.1923, 60–3302, 60–3309.

6. Sanik v. Shryock Realty Co., 156 Kan. 641, 135 P.2d 545.

7. Stimec v. Verderber, 152 Kan. 582, 106 P.2d 708.

8. Cf. Osborne v. Davies, 60 Kan. 695, 57 P. 941; First National Bank v. Duncan, 80 Kan. 196, 101 P. 992, 28 L.R.A., N.S., 327.

9. G.S.1923, Id. 1949.

10. Possibly contra, Gibson v. Bodley, 156 Kan. 338, 344, 133 P.2d 112. Cf. Frogge v. Kansas City Public Service Co., 159 Kan. 687, 157 P.2d 537.

11. G.S.1925 Supp. 22–222 and 22–223.

afterwards." Numerous Kansas cases are cited in support of this view, some of which will be referred to. Plaintiffs, in their reply brief, state: "Though the Supreme Court of Kansas has made some loose and sweeping declarations as to various actions which it has attempted to squeeze into the term 'will contest,' it is nevertheless entirely unpersuasive that an action of the present kind constitutes a contest of a will within the meaning even of the Kansas Decisions." The principal Kansas case cited by plaintiffs in this connection is Allbert v. Allbert, 148 Kan. 527, 83 P.2d 795.

In ruling upon the motion to dismiss and at the pre-trial and trial this court took the view espoused by the plaintiffs, viz., that the issue to be determined is whether the testamentary trust is void and a resulting trust in favor of the heirs at law exists. In that view, it seemed to the court, the instant proceeding need not be, and that it was not, a contest of the will. But the Kansas cases, which have now been carefully re-examined, do seem to support the theory and contention of the defendants and intervenors. Thus, in Axe v. Wilson,[12] it was said: "This court has repeatedly and upon deliberate consideration ruled that an action which in effect contests the will is a will contest action and must be brought as such under the contest statute or not at all. (Citing numerous cases.)" 150 Kan. at page 804, 96 P.2d at page 887. In one of the cited cases, Rishel v. McPherson County,[13] the fifth syllabus indicates the factual similarity to the present case. It is: "5. Same—*Grounds for Contesting Will—Incapacity of Taker—Void Charity*. The will devised property to a county as trustee for a public charity. *Held*, incapacity of the county to take and to act as trustee, and invalidity of the charity, were grounds for contesting the will, and could not be urged to defeat the will after lapse of the period allowed for contest."

In the opinion in the Rishel case it was said: " * * * whoever seeks to impair

the effect of a will to vest title to the testator's property in his legatees or devisees, by denying its validity, finds both his right and his remedy in the statute, or not at all."

Later, 122 Kan. at page 753, 253 P. at page 592: "Plaintiff contended the will was invalid because McPherson county is not qualified to take or hold or act as trustee, and because other conditions essential to a valid trust for charitable uses were wanting. To state the contention is to state a ground for contest of the will. Probate establishes prima facie not merely due execution and attestation, but validity of a will. R.S. 22–224. The purpose of contest is to establish invalidity. The statute does not specify or limit grounds of contest. The cause of action may be anything which may be urged as destroying validity. Anyone having an interest may, within the statute period, propose grounds of contest. After that period has elapsed, he has no more privilege to contest a will than he would have if he were originally a stranger having no interest." pp. 753, 754. See also cases cited in the margin.[14]

Allbert v. Allbert, supra, cited by plaintiffs, is not contrary to the rule of the cited cases. In that case the validity of the will was not in issue. It would be apposite here if, peradventure, the deceased had been holding the property as the trustee of a resulting trust at the time of his death.

From what has been said, it is apparent the court now has some doubt as to the correctness of its ruling declining to dismiss the petition in the present case upon the ground that the action is one to contest the will of the deceased and hence is barred by the statute. But however that may be, the court adheres to its ruling; and, inasmuch as the case has now been fully tried, it will be decided upon the merits.

Briefly reviewing the basic facts, the deceased, at the time the lengthy codicil giving rise to the present controversy was added to his will, was in his eighties, a bachelor

12. 150 Kan. 794, 96 P.2d 880.

13. 122 Kan. 741, 253 P. 586.

14. Yeager v. Yeager, 155 Kan. 734, 129 P.2d 242; Egnatic v. Wollard, 156 Kan. 843, 137 P.2d 188; In re Estate of Denton, 166 Kan. 411, 201 P.2d 625; Kunze v. Kunze, 145 Kan. 72, 64 P.2d 568.

whose parents and brothers and sisters had all predeceased him. Obviously an intelligent and thoughtful individual, he appears to have been interested in the welfare of his fellow men, especially in those whose educations had not been completed. He had much real estate, largely devoted to farming, and seems to have been almost "property poor" at the time of his death. In any event, some of the real estate was subject to mortgages, interest was due and owing, and taxes remained unpaid, all in the aggregate amount of approximately $65,000, which substantially reduced the actual value of his gross estate, appraised at $211,860.

The estate was closed in the probate court, September 26, 1929, whereupon, by order of that court, the property in the estate was assigned and delivered to the trustees named in the will. Almost immediately thereafter came the financial and business depression of the 1930's, accentuated by droughts and crop failures. The trustees and their successors carried on, administering their trust in a diligent and efficient fashion, for aught that is shown by the evidence in this case, and by 1945 they had cleared the property of all indebtedness. Three years later, when the instant suit was filed, they had cash on hand and government bonds aggregating more than $50,000. The present value of the property belonging to the trust estate has not been shown; but it seems to be in excess of $300,000—possibly even in excess of half a million dollars.

While no part of the income of the trust has been distributed to the high schools and universities, no contention is made that the trustees have been guilty of any act of malfeasance. The amended complaint alleges and the evidence shows that "all of the net assets of which the testator died seized, together with the increment therefrom * * * remain in the hands of the said trustees at the present time." Issue is squarely joined upon whether it is "possible [for the trustees] to establish any one of the * * * purported trusts or to attempt to carry out the specifically expressed intentions of the testator * * *." (Par. 8, Amended Complaint.) Plaintiffs' contentions have been partially summarized above. The trustees assert that they propose to carry out the terms of the trusts and that it is not only possible but mandatory for them to do so. The beneficiaries join in this assertion, request that the income be paid over to them and pledge themselves to use it precisely as directed by the testator. Should this court, at the present time and on the basis of the showing made, stay the contemplated action of the trustees, take away from them the funds they have been conserving for more than twenty years and direct that they be turned over to the collateral heirs of the decedent contrary to his expressed wish? That is the basic question before the court.

The provisions of the trust with reference to the universities will be considered first. They are set out in full in the findings and need not be repeated. They provide generally for the payment of the income of the trust to the two universities [except that paid over to the high schools] "in equal shares for the purpose of installing a chair in each"—construed by the Supreme Court of Kansas [15] to mean establish professorships—"for the purpose of teaching" the enumerated subjects.

Learned counsel for the plaintiffs center their attack largely upon the clause of item V of the codicil reading as follows: "* * *; the evils of the use of narcotic drugs as a medicine or for any other purpose when taken internally; it being the purpose of this bequest to demonstrate to future generations the utter uselessness of narcotic drugs and narcotics in all forms when taken internally, and to prove that the use of the same is not only unnecessary, but is positively injurious to the human system and destructive of health and longevity."

Plaintiffs' testimony was directed chiefly toward establishing that the use of narcotic drugs by legitimate practitioners of the medical profession is not always an "evil" and that a teaching, especially in a medical school or in connection with pre-medical

15. Heffelfinger v. Scott, 142 Kan. 395, 47 P.2d 66.

training, of the "utter uselessness of narcotic drugs and narcotics in all forms when taken internally" is fallacious. Hence, it is said, it would be impossible for the schools "to teach the testator's doctrines and theories" and it is futile to expect them "to discontinue or to condemn the very extensive use" that is now being made of narcotics in the schools of medicine, by medical practitioners and in the hospitals. In that connection, starting with the sound premise that the will of the testator cannot be remade by a court or by the trustees and no "single phrase [can] be stricken down in order to make it possible" for the schools to qualify, they urge that the clause cannot be complied with. Therefore, it is argued that if the doctrines are to be taught at all it must be in accordance with the provisions for gift over, in item 6—i. e., through a school and hospital to be established at or near Topeka.

■ Extended discussion of well-established principles pertaining to charitable trusts, doctrine of *cy pres*, rule against perpetuities, gifts over and the powers and duties of trustees seems not to be required. The aphorism that a will is to be construed to effectuate the intent of the testator, if possible, is apposite in construing item 5 of the codicil now under examination. Under it, the testator obviously intended that the range of teaching by the professorships be quite broad—natural laws of health, natural food for man, balanced ration, hydropathy, electrical massaging; prevention of various enumerated diseases and the causes thereof; treatment of crippled and deformed children by massages, exercises, etc.; to help expectant mothers to care for their offspring; to care for tuberculous patients and thus prevent the spread of the dreaded disease; in general how to keep clean and well and how to prevent sickness and disease—to mention only some. Then follows the clause requiring that the "evils of the use of narcotic drugs as a medicine * * * when taken internally" be taught. Reading all of them together—and, incidentally, the punctuation used suggests that be done—it is apparent the testator was trying to enumerate things which he believed would be of substantial benefit to mankind.

But, learned counsel for the plaintiffs urge, the testator's "preachments" with reference to the evils of the use of narcotics "are not redeemed by the dozen or more other subjects which he prescribed and which are unobjectionable to truth and knowledge." It is charged he "attempted to utilize them as half truths in an effort to buttress his false theory" and "all that he said about the natural laws of health, etc., was to attempt to use them as adjuncts to his principal purpose." The argument is ingenious; but in this court's studied judgment it is unsound.

First, there is not a scintilla of evidence showing that the testator's sole purpose in establishing the trusts was to prevent the use of narcotics in the palliative treatment of disease. As a matter of fact, no evidence whatever was introduced upon this subject. Examination of the chain of events which is shown, however—the earlier will and the first codicil to it—indicates the contrary. Thus in the will as originally prepared in April, 1919, the provisions with reference to the trusts for the benefit of the high schools are in essence the same as those in the second codicil with this significant exception: In the original will the clause referred to "the evils of the use of drugs as a medicine" whereas in the second codicil, executed more than six years later, the word "narcotics" was inserted preceding the word "drugs." Thus, for at least that period of time, it seems to be clearly indicated the testator was interested in minimizing the use of all drugs in the treatment of disease.[16] The same thing occurs in connection with item V of the second codicil. In the original will, in which only the state university was a beneficiary, "the evils of the use of drugs as a medicine" was specified, the word "narcotics" being inserted in the second codicil. One other significant circumstance, tending to belie the postulate adopted by plaintiffs, is codicil I, referred to in Finding No. 4. In it the testator directed that the terms

16. Cf. Glover v. Baker, 76 N.H. 393, 83 A. 916.

"physiological therapeutics," "physiology" and "physiology and hygiene" be "construed to include 'physiology and hygiene' in the broadest and most practical signification of said term." Thus, it seems clear he was vitally interested in physiology and hygiene and in having it taught in connection with the other dozen or more subjects enumerated. None of them should, therefore, be ignored or, on the basis of the present record, be construed to have been enumerated purely for the purpose of buttressing a "false theory."

Second, it should be kept in mind that the testator, throughout the provisions of his will, was dealing with and specifying the use to be made of *his* funds. He did not undertake to dictate to the several institutions what should be taught by them generally—he referred to the "funds herein provided;" "to use said funds in promulgating a doctrine;" "to use said funds for the purpose of promulgating a system of therapeutics;" "to apply said funds to the subjects in said item recited;" "to provide for the application * * * [of the funds] to the purposes recited;" "withdraw the benefits of the said fund from said institution" to mention a few of the expressions in his will and codicil. Thus, regardless of what may have been taught in the institutions pertaining to the use of narcotics in surgery, psychiatry, neurology and such subjects, there would be no violation of the trusts established by his will unless the institution "or either of them have failed to use said funds in promulgating a doctrine in line with the provisions of * * * Item 5."

Third, the beneficiaries have all expressed a willingness "to accept such fund or funds" (Finding No. 11), have certified that they are "equipped in all respects to receive and apply said fund or funds to the objects and subjects * * * provided * * * [and will] in all ways and manner provide for the application of such funds in accordance with the spirit, purpose, directions and intention of" the testator.

Nor can the court spell out of the testimony of the responsible officers of the institutions, especially the universities, a repudiation of the formal orders made, in which it is stated such institutions are "willing and * * * in all respects equipped to use such fund or funds as directed so that the theories and purposes as expressed in said instruments shall be, and will be, promulgated by the fund or funds so provided." The Dean of the School of Medicine of the state university testified that the money would be used "exactly as requested in the will and codicils." (T 176.) He expressed the view "that if we teach the evils of the use of narcotics drugs we have literally complied with the wordage of the will and the purposes in terms of demonstration to future generations are in no way concerned with the courses which we will teach in the Department of Public Health and Preventive Medicine." (T 177.) He stated categorically that no part of the funds provided under the will would "be used to promulgate a system of therapeutics requiring or sanctioning the use of narcotic drug medication." (T 184.) The Dean of Kansas Wesleyan testified generally to the same effect. He said, inter alia, "there is absolutely no reason whatsoever, as I see it, why we couldn't, if we were to benefit under this will, comply in every respect with the terms of it" (T 240); that Kansas Wesleyan can, and does, offer instruction upon the evils of the use of narcotic drugs as a medicine or for any other purpose when taken internally (T 245); and that it teaches the use of narcotic drugs is injurious to the human system and destructive of health and longevity. (T 245.) True it is, as set out in the findings, the institutions do not propose to abolish the use of narcotics at the hospital or to discontinue teaching in the medical schools the beneficial use of narcotic drugs; but, as previously pointed out, they will not use the funds derived from the defendant-trustees for those purposes.

This, already too-lengthy, opinion will not be extended by discussing the other questions raised by the defendants and intervenors, including whether the holding by the Supreme Court of Kansas, in Heffel-

650

finger v. Scott,[17] that the trusts are charitable trusts, is here binding. The court is of the opinion and has found as a fact that the several beneficiaries are ready, able and willing to use the funds provided by the will of the testator precisely as directed by him. At the risk of supererogation the court has retained jurisdiction for the purpose of seeing that they do so. Plaintiffs' prayer for relief must be, and it is, denied. Appropriate decree should be prepared by counsel for the defendants and intervenors. Settle in accordance with the Federal Rules of Civil Procedure and the Rules of Practice of this court.